May it please the Court, my name is Peter Schau from Morrison & Forster, representing the appellant, the defendant, and the case below, Mattel. Your Honor, Mattel would seek to have this Court, forgive me, may I reserve eight minutes for my rebuttal? If you're on time. Thank you, Your Honor. Mattel would seek to have this Court reinstate the order of the arbitrator after the first arbitration. What I found an especially interesting question in this case was severability. I had never seen another arbitration agreement like this. Usually the idea is to avoid the courts when you arbitrate. Then I read the Keosara case and discovered there was another arbitration agreement like this. Our court said, no dice. You can't do it like that. So what I'm really interested in is severability. One way to look at it is, well, they sign an arbitration agreement and they just get the very, very limited review that's available under the Federal Arbitration Act. And the first decision sticks. But I was thinking, boy, if you negotiate an arbitration agreement that has such an extremely large role for the court to play, it's really more like hiring a special master with extensive review by the district court. I have no reason to think that the parties would have agreed to arbitration had they known that they would not get that sort of extensive judicial review. And maybe they do want to read arbitration on those terms, but they didn't. And I have no reason to think that they would. So why don't we just toss everything out and just start over from scratch? No arbitration agreement. That's the clause under Keosara is both of its essence and invalid under Keosara. Your Honor, at times I'll refer to Keosara as Lapine 2 to distinguish the two Ninth Circuit opinions. And Lapine 2. By Lapine 2, you mean the en banc? Yes, Your Honor. By Lapine 1, you mean the panel opinion? Yes, Your Honor. Panel opinion no longer exists. We vacate them when we take them en banc. Yes. Parts of our discussion, though, implicate Lapine 1 to the extent that the procedural history of Lapine reflects the procedural history in this case. In answer to your question in Lapine 2, the court en banc directly addresses the question of severability applying a test in California law. Both parties have researched Oregon law to see if there's any substantive difference between the test for severability in Oregon and the test in California. And the answer is there is not. Oregon severability law quotes CJS, other horn books, but applies the same test. And the en banc court speaks directly to what that test is. There are two parts to it. The first part of the severability test is whether or not the illegal provision permeates some other part of the agreement. And the second part of the test is whether or not the separation of the illegal provision would in any way create the kind of interdependency problem that would in the Oregon state case law and the California state case law make the rest of the contract unenforceable. Recall that in Lapine 2, the contract also provided a very detailed provision for judicial review under the Federal Arbitration Act, but also in extra statutory terms, other standards of review that could be applied. And recall also in Lapine 2 the importance of the contract. There was a quarter of a billion dollars at stake in Lapine 2. It must be my own fault, but I lost the thread here. Once you give me those standards, why is the review provision severable? There is no substantive difference between the arbitration contract in this case and the arbitration contract in Lapine. In both cases, applying the first test, there is no permeation of the provision applying for judicial review of the final arbitration decision in this case as opposed to the provision in Lapine. What does permeation mean? Your Honor, I believe what it means is that the term can't be separated. When you look at the substance and the language of the arbitration agreement, you can't easily take one section and just move it to the side, that the provision that is intended to be severed appears in multiple places within the document, and removing that provision would make other parts of the arbitration agreement unintelligible or unenforceable. And how do you deal with Judge Kleinfeld's other concern, that without this type of severable part because it doesn't permeate anything else, maybe the parties would have never agreed to this in the first place? And that's exactly the argument made in Lapine 2. The core argument in Lapine is that the parties facing a quarter-of-a-billion-dollar dispute would never agree to an arbitration provision unless it contained the types of expanded judicial review agreed to by the parties. It's the identical argument that's presented by Hall Street in today's appeal. That's why applying the law of Lapine 2, as set forth by this Court in its en banc decision, there is no substantive difference either in the law to be applied or in the form of the arbitration agreement. In both cases, the illegal provision is severable because it does not permeate in its language any other part of the arbitration agreement. And second, it is independent, not interdependent. I couldn't understand, actually, what the en banc opinion was saying about that, unless what it meant to be saying was that it was dependent on the facts in the particular case. In part, it is factually dependent, but for all the facts that appear in the en banc decision, the arbitration agreement in our case is identical, substantively and in form identical to the agreement that was severed in Lapine 2. Why doesn't it permeate? Well, I noticed that one thing that they said you're supposed to weigh in, Kiyosara, is the overall interest of justice under the California Supreme Court decision, not allowing a party to gain an undeserved benefit when the other party suffers an undeserved detriment. I don't know. It's all awfully general. For me to make sense of permeate and interest of justice, I sort of feel compelled to ask myself would they have made the deal if they didn't have that part of the deal. And, of course, that in Lapine, neither party sought en banc review. Neither party in Lapine 2 challenged the extra statutory judicial review clause. Neither party sought severability. But what the court decided. So what? A lot of our en bancs come from sua sponte calls by judges. But the point, Your Honor, is this, is that there is no principled way of distinguishing the arbitration agreement in Lapine 2 from the arbitration agreement here. The courts query, but the parties never would have agreed to the deal. Do you need a factual hearing below so that the court can make a determination of whether it permeated? There is nothing in either the case law, the agreement that's presented to the court or the briefs that suggests that such a factual hearing is necessary. The court's inquiry is the parties never would have agreed to the deal if the judicial review provision was not written the way it was. That's exactly on all fours the argument that the en banc panel in Lapine 2 addressed and severed the contract on. So applying the legal test that's provided. Why did they exactly? You paraphrased in your words what the reason was. That's precisely why they did it, Your Honor. The discussion of severability cites California Supreme Court authority into. Yeah, I know. But you summarized it. Give me the reason why it didn't permeate. That is the reason. The court found that the provision for judicial review did not permeate. It was distinct, a distinct section for legal review from all the other terms that were provided for for the rules of the arbitration. I think the court has put its finger, though, on the simplest ground to reinstate the decision of the arbitrator, which is the en banc decision in Lapine 2. The brief filed by Hall Street suggests by footnote that Lapine 2 is incorrect and suggests that the court should not follow it. There is in the Ninth Circuit not an issue about whether or not Lapine 2 is correct or incorrect. We're talking about the same thing, right, Kyocera Corporation versus Prudential Base Trade Services. Yes, Your Honor, the en banc decision in that case. In Lapine 2, that is the law of the circuit, and the law of the circuit is that there are only Congress. And that clause, review clause in that arbitration agreement, was very similar to the one in your case. That's correct, Your Honor, very similar. There's no substantive difference between the two clauses. So that's the straightforward way for the court to reinstate the decision of the arbitrator. You know, that also makes sense to recall that just as this court would not make a reversal of a finding of fact from a witness that it's never heard and would instead apply. Tell me about footnote 17 in Kyocera. No party argues that the invalidity of the standard of review section should affect any portion of the contract other than the arbitration clause. Yes, Your Honor. Does that have any bearing on severability? I don't think it does, Your Honor. I think that the test that's being applied, citing again to this California Supreme Court authority in the little case, does not depend upon whether or not a party raises the issue. It reflects the court's comment to me just a moment ago that it doesn't make a difference whether the party raises the issue. The law is what it is. Okay. Thanks. I don't want to take up more of your time on that. That's the issue that most interested me. Your Honor, I think, though, that is the main issue in this case, and so most of my time should be spent discussing the finding. We also know that the little court, meaning the California court, severed a term providing for arbitral review of an arbitration award. If internal arbitral review was not sufficiently central to the purpose of an arbitration process to defeat severability, then surely the external scope of judicial review is not sufficiently central to the arbitration clause to defeat severability. Yes, Your Honor. In Lapine 2, the clause is actually even more restrictive. There's even more reason to sever the clause in the arbitration agreement present in this case. Your Honor, the other way of attempting to distinguish Lapine is that the arbitration agreement was entered into and approved by the court before the arbitration took place. And, again, that is indistinguishable from Lapine. Recall in Lapine it was this court that first in Lapine 1 approved the judicial review clause and sent by its order the arbitration back to the district court for application of the illegal judicial review clause. That is indistinguishable. And so the principal argument raised by Hall Street for why the case is distinguishable does not make the case distinguishable. So other than an invitation for this court to find that Lapine 2 was incorrect and choose not to follow it, there is no principal basis for this court not to proceed with reinstating the arbitration decision as the original decision. Your Honor, I said that. This is an impertinent question from an outsider, an outsider to this circuit. But in thinking about what the Court of Appeals did in Bank and here, Sarah, is there anything inappropriate in having a decision like that by the Court of Appeals, which is obviously a carefully thought-out decision to change the law of the circuit, is there anything inappropriate about that having retrospective applications so as to destroy the expectations of people who entered into the agreement that I think underlay Judge Kleinfeld's question to you? Two responses to the court. One, in Lapine 2, the court directly addressed that question. And what the court said is, on Bank, we know today's decision will have far-reaching impacts, not only for future litigants but for litigants before the court. So the court knew on Bank that their decision would change the law and would change the position of parties even in pending cases before the court. Given that consideration, the Ninth Circuit, not just in panel decision but on Bank, felt that it was more important to immediately clarify the law so that future cases could proceed under the correct standard of legal review. And for that reason, the balance of consideration between immediately correcting the law and between affecting the rights of litigants already before the court was drawn in favor of immediately correcting the law. The ñ what I'd like to do, Your Honor, if I could, is I think I'd like to at this point reserve the rest of my time for rebuttal. I think I've addressed the simplest way for this court to proceed. Thank you, counsel. Thank you, Your Honor. May it please the court, my name is Michael Garone and I'm representing Hall Street in this matter. There are a lot of issues in this case, and apparently Mattel has elected to proceed basically on the first issue, which is the caesaro. So I'll put the bulk of my time into that issue. I think I sort of elected for him, at least for the first part of their argument, because severability is the issue that most interests me here. Your Honor. Can you talk about severability? Yes, Your Honor. Before I could, though, could I talk about whether caesaro really applies here, and then I'll address severability with you. I think in the first analysis, it would be my ñ Would I forget about caesaro or severability, or else I keep thinking about it and trying to avoid being distracted by your argument? Well, it's always a mistake not to answer a judge's question. Well, Your Honor, I'll answer severability now. I'll take your ñ I'll take your ñ Then I'll be able to listen when you talk about something else. Okay. Your Honor, I believe that if caesaro is held to be applicable here, then this judicial review provision should be deemed severable from the arbitration agreement as a whole. Okay. Can you distinguish caesaro? Under Oregon law. Your Honor, in this case, we have ñ in caesaro, the parties argued that we would have never entered into the agreement had it not been for the judicial review provision. In this case, we have evidence to that effect, Your Honor. You look at the joint status report, which was submitted to the judge at the time that the parties were talking about whether they should arbitrate. Do you have an excerpt reference for that? Yes, Your Honor. It's SCR 148 and 149. It's a supplemental excerpt of record. And I'll read that to you. It states that the parties were unable to settle the case at the mediation stage and at the suggestion of the mediator, the parties agreed to seek to reach an agreement by which all remaining issues in the case could be resolved through contract arbitration that would require the arbitrator to prepare written findings of fact and conclusions of law and allow for judicial review. And then it goes on about the judicial review standard. That was the central purpose of the arbitration, Your Honor. And the central purpose of the agreement to arbitrate was ñ Hold on. How does that ñ let's see, caesaro, I think they did say there's no evidence that this was really critical to the parties. How do these words show that here there is evidence that it was really critical? Well, the agreement itself is defined by the parties as an agreement by which the arbitrator would issue findings of fact and conclusions of law and the district judge would have the ultimate authority to decide the case. And then you look at the affidavit of Mr. Finn, which is SCR 152, and he says one of the primary features of the arbitration agreement was that unlike ordinary binding arbitration, the arbitration decision would be reviewable by Judge Jones. What did he say? One of the primary features? Yes. And so, Your Honor, if you look at caesaro, they talk about the central purpose. And they're citing a California case, which I'm not that familiar with California law, but they talk about, you know, what is the central purpose of the arbitration agreement. And in caesaro, they were not able to conclude that the judicial review provision was central. So the way we distinguish caesaro is there there was no evidence, here there's evidence. There's clear evidence that the parties would not have. The evidence is those two things. Any more that you want to point to right now? Well, yes, Your Honor. Well, I'm sorry to point you to that. Where does it say in caesaro that there's no evidence of this other than the argument of caesaro? Well, it doesn't say that. All it refers to, Your Honor, is that the parties argue that they never would have entered into arbitration. It doesn't refer to any evidence. And from that, I'm assuming that there was no evidence presented on the point. Well, the in-bank court doesn't seem to care. They seem to accept that. They accept that. Caesaro says we would have never entered into this thing if we'd have known this was going to happen. The court accepts that and says it doesn't make any difference. I don't see why caesaro is much different than this case. Your Honor, I would also point out that if you look at Oregon law, not California law, counsel says he doesn't believe Oregon law is any different. But we cited the George case and the Maligni case at footnote 7 of our opening brief, and there's no discussion in those cases, to my recollection, of the term permeation. What the courts in Oregon state is that if provisions are so intertwined or interrelated. That's why it sounds like a different way of saying permeation. Well, I don't think so, Your Honor. I think in this case, and if you look at these cases, the George case and the Maligni case, they say you have to look at the facts and circumstances of the parties, and you have to look at the terms of the agreement they entered into to determine if the contractual clauses or parts of the contract are divisible or not for purposes of severability. And in this particular case, you have to then look at what the parties did. In this case, and I guess I was trying to answer or put forth my position on why this is different than caesaro. In this case, the parties had the right to a judicial decision on their claims, and they came to court without any arbitration agreement at all. Despite what Mr. Hsiao says, in caesaro, there was a stand, there was an arbitration agreement that was entered into by the parties before there was any lawsuit. Here you were victimized by the court. Well, and, Your Honor, that's one of my points is this is really not your classic FAA. I don't see why that matters. I mean, the judge couldn't make you sign an arbitration agreement. He could make you try to mediate, but that's altogether different. That's just an amicable chat compared to arbitration. Well, Your Honor, in caesaro, the parties had entered into an arbitration agreement. The judge didn't, the court didn't approve that arbitration agreement beforehand. What happened is there was an argument about whether it applied or not. The court initially said. What does it matter? You enter into an arbitration agreement voluntarily, sooner, later, before litigation, during litigation. I don't understand why it matters. Well, Your Honor, I think our position is that this was done by court order, and it harkens back to your. . . The judge didn't order you to sign it, did he? No, he didn't order us to sign it, but he could have said I don't approve it, and when he approved it, it really takes it out of a contractual agreement, and that's why we really don't think caesaro even applies here. In this case, we have a court order, which basically approved the party's desire to engage in a more streamlined. . . I don't see how that adds, though. What does that add, or what does the lack of a court order detract? Well. . . In an arbitration agreement, it's like a rose is a rose is a rose. There it is. It's the arbitration agreement. The court says I approve it. What does that add? Well, I guess, Your Honor, if the court, for instance, would have called this. . . I mean, I suppose the court could have said, well, I hear you want to put this in front of a third party, another person other than me. Let's appoint a special master, and we'll have the parties split the costs of the special master, and then we'll do it under the special master rule, FRCP 53. In essence, it's the same scenario, what he did here. We're calling it arbitration, but is this truly and really arbitration, or is it really just a glorified or another way of really appointing a special master to decide a case that was within the jurisdiction of this court? Mr. Guron, maybe you can help me put it this way. I'm one of those people who's basically a trial judge, and let's assume for the moment that somebody was misguided enough to make me a district judge here in the Ninth Circuit. Is it your understanding that after Kyocera, I, as a district judge, would still have authority to approve an agreement which provided for me to review an arbitration? I think the judge would just have to do it under FRCP 53, and in essence it's very similar to what the judge did here. We had an arbitrator. We called it arbitration, but the judge would have the authority under FRCP 53 to do the very thing he did here. The parties could agree upon essentially the same standard of review that we have here and just do it under the aegis of one of the federal rules, and I think ultimately— I'm not following you. Notwithstanding what Kyocera says, a trial court judge could do it anyway, so long as the trial court judge puts a different label on it? Well, under FRCP 53, he could appoint a special master, make the parties split the cost of the special master, and have him, the trial judge, review the special master's report under the rule, which the rules provisions are essentially the same as what we had here, which was de novo review on legal issues. It wouldn't be exactly the same as arbitration because you wouldn't have the American Arbitration Association rules. You'd have the federal rules of civil procedure. Right. But here we agreed to follow the federal rules of civil procedure if you look at the rules for the arbitration. So, in essence, and that's why I quarreled, I guess, with the initial assumption that Kyocera necessarily applies here because the court in Kyocera, I mean, they make some comments. Well, I understand your argument, but you're asking us to construe something in a— what was an arbitration? There was an arbitration agreement. It wasn't a special master. Well, Your Honor, again, the difference is, I think the ultimate difference is, in Kyocera, the court had no jurisdiction to decide the merits of the party's dispute because there was an arbitration agreement which required that the parties present it to a dispassionate arbitrator. Here, the judge, in essence, gave away part of his jurisdiction, but the judge never relinquished jurisdiction over the case. In a standard arbitration, the court does not obtain jurisdiction until the arbitrator completely finishes the case. I'd be a lot more comfortable with this if the parties in the district court had used the word special master under Federal Rule of Civil Procedure 53 instead of using the word arbitration. Once everybody uses the word arbitration, I look at Kyocera and I think en banc, if I say, even though it said arbitration, used pretty much the same language. It wasn't. Judge Romer and I tried the manifestly unfair approach in that case. It didn't get anywhere. Well, Your Honor, but again, if you look at the language of Kyocera, it says once the case reaches the Federal courts, however, the private arbitration process is complete and because Congress has specified standards for confirming an award, Federal courts must act pursuant to those standards and no others. This case, that those facts do not exist. There was nothing complete. The court, in actuality, decided part of the case before the arbitration was conducted and the court never relinquished jurisdiction over the case. In essence, the, quote, arbitration, unquote, was really just an adjunct to the Federal court litigation and it would be, I think, unjust in this case to apply Kyocera to these particular facts because the purposes of Kyocera were twofold, to prevent private parties from defining the jurisdiction of the courts, which is not true here, and the second purpose of the Kyocera case was to prevent arbitration from becoming a mere prelude to more complicated and expensive litigation and, of course, that's not present here as well because there was no arbitration prior to the lawsuit. So really, the two central purposes of the decision are not present under the facts of this case. Your Honors, there are several other issues here that I'm not sure, there are four or five issues that I don't know if the court is particularly interested in any one of them. There's a timeliness issue that's been raised and we, with regards to the appeal of the arbitrator's decision to the district court, and if the court's interested in that, we can talk about that. I guess, though, since we're stuck on this Kyocera thing, I would again urge you to look at the severability analysis differently under Oregon law than under Washington law because under Oregon law, I think you have to look carefully at what the central purpose of the parties' agreement was. And what part of Oregon law do you want me to read before I make the decision? Well, I think you should read the cases that are cited in our footnote 7 in our brief. Footnote 7? And I think you can also look at the Kyocera court's treatment of it to some degree because they also talk about the central purpose of something. And the central purpose of this arbitration agreement was to have an arbitrator decide the case under very limited parameters. And there's evidence here that that purpose was central, whereas in Kyocera, my reading of the case indicates to me that there was no particular evidence ever submitted on that point. In addition, I think you do have to look at the justice issue here. Is it just to, in midstream, when a federal judge has approved your agreement, to then apply Kyocera, which is a case which stands for the proposition that private parties can't define the federal court's jurisdiction? Here, the federal court defined his own jurisdiction, and that's a fundamental difference. District judges have been wrong before. That's true, Your Honor. Given what their jurisdiction is. But here, again, I would submit to you that when you have a Ninth Circuit precedent, the fundamental purpose of which is to prevent parties from doing it, that when the parties come to the judge and say, we have this idea that was given to us by a law professor as a suggestion, and the court says, well, that's fine, let's do it, that it would be really unjust for you to then say, well, we're stuck with a decision that we didn't bargain for, which is an erroneous legal decision. So a judge, an individual judge, can create jurisdiction where that exists? No, Your Honor. I'm not suggesting that the judge can create jurisdiction, but I think you have to analyze this case and look at Kyocera and look at what the fundamental purposes of that case were. And the fundamental purposes of that case were to prevent arbitration from becoming kind of a nullity or an irrelevant procedure because you were always going to then go to court afterwards. This case does not pose that problem because the parties were already in court. They had the right, theoretically, to a jury trial. Is that what Kyocera says the purpose of the opinion is? Yes. It says that the two purposes – What the Kyocera court said was that the expanded judicial review provisions upheld would relegate arbitration to a mere prelude to more expensive, cumbersome – But that's just a description of the result, not the purpose of the decision. Well, I think – The decision is to recognize the limits of the law. But I think, Your Honor, if you read the decision carefully, they use that as the policy reason. The policy reason for the Ninth Circuit's opinion in Kyocera was that if you allowed this, you were going to undercut arbitration and undermine arbitration. I think what they did was they eliminated hybrids that are sort of halfway between arbitration and litigation. Either you litigate in court and get regular judicial review or you arbitrate and you don't, and you don't have an in-between hybrid. But, Your Honor, in this case, again, I think it's crucial to look at the fact that the trial judge never divested himself of jurisdiction over this case. He was intimately involved. He approved an agreement where instead of proceeding to trial in front of him, the parties would arbitrate. Right. But he didn't stay the proceedings. For instance, he was – he had control over the issues of appointment and arbitration. You mean he went forward with discovery and submission of witness lists and deposing experts and all that in the district court, even though in picking a jury, if you got to that, and making motions to dismiss and for summary judgment, even though you were arbitrating? Well, he wasn't doing those things, Your Honor, because he was going to wait until the arbitrator's decision. You weren't doing those things. Nobody was doing those things. Because you were arbitrating. Right. But I guess what I'm arguing is that in the classic FAA situation, either the arbitrator has jurisdiction or the court has jurisdiction. When the arbitrator is done with his award, then you can go to court under Section 9 or Section 10 of the FAA and seek judicial review. That's one thing. In this case, the judge always had jurisdiction, never divested himself of jurisdiction, and merely, in essence, appointed another party to take evidence. I wonder if he did. Once there's an arbitration agreement, the only significance I can see to the judge's approval is, okay, I'll let you take yourself out of my court and go to arbitration instead. And that does seem like a divestment of jurisdiction. I'm thinking, suppose the judge had said, hey, I don't care what kind of agreement you sign. You file your witness list on such and such a day. You file your cross motions for summary judgment such and such a day. I'm picking a jury on May 15th. I don't care what you do. If you're not here to help with picking the jury, I'll just pick it myself. And we're starting the trial as soon as we have the jury picked. Whether you're here or not, you forfeit if you're not here. If he had done that, I think probably we would have gotten a motion saying, no, Judge, you don't have jurisdiction anymore. We're arbitrating. Well, Your Honor, again, you know, I guess looking at arbitration in the typical sense, this is not your typical arbitration. In fact, I think calling it arbitration may even be a misnomer under what ---- Parties agreed to call it that. Right. And the fact that we called it that, though, I think you need to look, again, at the purposes of the CAYASERA decision. The purposes of the decision are central to the holding in the case. And I think it's simplistic for Mattel to argue simply that CAYASERA just applies on all fours and there's nothing else to be said about it. Number one, the purposes undermining the arbitration or underlying the CAYASERA decision are not present here. Number two, we have a severability law under the State of Oregon, which we think is different than this. I looked at the later of those two cases, and I can't get anything out of it, actually. All it says is, this is moiny. Right. Whether they are severable from the first promise, thereby making the contract divisible, depends on the intention of the parties as reflected in the words that they use. Right. Just the most general description of how you do contract law. Well, Your Honor, if you look, again, The intent of the parties is reflected in their words. Right. I don't get anything there that advances the inquiry for me. Well, Your Honor, if you look at the arbitration agreement itself, almost every provision of the arbitration agreement refers to the court's authority and the court's review. The first paragraph talks about Where should I look now in the excerpt? Look at ER 54, which is the actual arbitration agreement. The first paragraph says that the parties agree to arbitrate with the right of judicial review with Judge Jones. That's the first paragraph. I mean, doesn't that First paragraph or the first sentence? It's the first – the second sentence of the first paragraph. Right after it says arbitrate, then it says What does the first sentence say? The first sentence says, The parties, in case number blank, agree to arbitrate before one arbitrator, all remaining issues not decided previously in this case by the court, the Honorable Robert E. Jones presiding. And then it goes on to say, The arbitrator shall prepare written findings of fact that may be reviewed by Judge Jones at the request of either party. Then you look at paragraph 2, and it talks about the issues in the lawsuit that have not been decided yet. Paragraph 3 also refers to the right of review to the arbitrator. Is this any different from the agreement in Kyocera? Well, I think it is, Your Honor, because in Kyocera, we had a standard arbitration clause as part of a larger contractual agreement between the parties, which was a standalone document not approved by a judge. Can you tell from the decision in Kyocera whether it had the same language? I'm trying to find out whether this is a legitimate distinction that we can make. I don't believe that you can tell, Your Honor, from Kyocera whether, for instance, the first paragraph mentioned judicial review or not. But in this case, it really does permeate it. It permeates every provision of the arbitration agreement. You can go down the paragraphs. Almost every paragraph refers to judicial review. Well, it refers to judicial review, but in reading it, it struck me that you said, read it again, may be reviewed at the request of either party. That doesn't sound like mandatory. It sounds like permissive. It sounds to me like Judge Jones could have said, well, I'm not reviewing it. Well, I think the right of review was a right under the agreement. It was just if the parties didn't ask for it, then he would not review anything. Well, what does it mean may be reviewed instead of shall be reviewed? I don't think. May be reviewed is very permissive. It seems to me that Judge Jones could have said, well, it may be reviewed at the request of either party. It's a request, and it may be reviewed, and I'm not reviewing it. Wouldn't that have been within the language of the document? It doesn't say shall be reviewed by Judge Jones. It says may be reviewed at the request. Well, it says, Your Honor, again, if you go to the rules of the arbitration, it talks about the – Well, what about the sentence you read? You said the very first sentence, very first part. What does that part mean? Well, I agree it uses the word may, Your Honor, but I don't think in the context of this whole agreement that the parties – Where does it say shall? It doesn't, but I don't think the parties intended that the judge could say, well, I'm not going to look at it. I think the whole intent was – and again, if you look at the status report, when we told the judge that we had agreed to this, we told the judge that the central purpose of it, in essence, was having the judicial review. The first rule of drafting, may is not a zero standard. Shall is. Your Honor, though, the – again, and again, I would challenge Mr. Schauder to come here today and tell the court that the arbitration judicial review provision was not the central purpose of the agreement. I think the parties would all admit that it was. And with that, we'll call upon Mr. Schauder, and he will admit that it was. Thank you, Your Honor. And I'll be shocked and fall off of my chair. I'd like to use my rebuttal time for four issues. Do you admit that it was? Your Honor, it was just as important as it was to Kyocera. Kyocera had 200 times more at stake than the case before us. So you admit that it was confession and avoidance. Your Honor, it was an important part of the agreement, but it was an important part of every agreement. Do you have a little problem with arguing Kyocera because paragraph 28 of the arbitration rules that you agree to say the parties agree that no party shall contest in any court of law the arbitration rules set forth herein? Your Honor, we don't contest the arbitration rules. But you are. You're contesting the rule in paragraph 27. You're saying it violates Kyocera. No, Your Honor. I think what we're saying is that Congress has spoken to this issue. The Constitution gives only Congress the ability to prescribe the standard. Well, it says you can't contest the arbitration rules as contrary to any law. Your Honor, whether we contest it or not, the Court's decision would be no different. Congress has clearly stated what the standard for judicial review is in the Federal Arbitration Act. And the Constitution gives only to Congress. But if you agree to something that's contrary to that, and you also agreed not to contest the unlawfulness of what you agreed to, how do you get to come in here and say what we agreed to is contrary to the statute? Isn't that exactly the point of Lapline? The parties there equally agreed consensually, and the Court, this panel, approved expanded judicial review. To the extent that there's consent, to the extent that there's agreement, to the extent there's judicial blessing, all of those are present in Lapline. The fact does not change. The Constitution gives to Congress the sole ability. I don't think Lapline, there was a clause like this, at least not so far as the opinion says. And I'm wondering if you could have waived your Kyocera claim. You cannot waive it. Congress is the only party that can establish the standard for judicial review for arbitration, the only party. Neither the Court nor the parties can change that standard of review. Whether we raised it or not, the decision of this panel should be the same. It has to be the same. Four points you wanted to make. You have two minutes to make. Your Honor, when you ended off with your discussion, you ended off with this discussion about how the district court may review the arbitration decision. I just want to point out that's the identical language that appears in Lapline, too. The Lapline agreement also says may. The second point, I think it's very important to clear up this argument using the word jurisdiction. The Federal Arbitration Act does not give a party jurisdiction to come before a federal court. You have to have independent subject matter jurisdiction to have an FAA case heard by the court. The FAA puts an overlay, the limitation of judicial review upon a case with independent subject matter jurisdiction. The fact that Hall Street believes that this case is different because there was no jurisdiction in Curacera to hear the dispute is 100 percent wrong. You could not hear Lapline, too, in this court unless there was independent subject matter jurisdiction. And, again, this case is on all fours with the case in Lapline, too. The point of this is, and why it is that this makes sense, is because, recall, in the second time that the district court reviewed the decision of the arbitrator, only the arbitrator has heard the witnesses. Only the arbitrator has been in a position to evaluate the intent of the parties, and he got it right the first time. The first time the district court reversed the arbitrator, he did it, one, with no appeal of the facts that he had decided, no challenge to them by Hall Street, two, with no record, there was no record of the arbitration placed before him, and yet he reversed anyway. The second time he reversed, he did have the record before him, but yet again, without hearing a single witness, he reversed the finding of the arbitrator. And isn't that, at the bottom, the whole point of the Federal Arbitration Act? The whole point of the Act is that courts, this is not where they should be. And if they're going to be there, the only place that they can be is where Congress says they can be. The only standard of review that can be applied, whether you call it a special master, whether you call it an arbitration, whatever you call it, if you're going to delegate away your ability to hear witnesses, to consider the record, to make decisions, in that context, Federal Arbitration Act completely occupies the field. And as a matter of review, that is the only standard of review that this Court can undertake. Mr. Shell, maybe I misconstrued the line of argument, but it seems to me that the distinction you were making about the fact that to get into court under the Arbitration Act, there has to be an independent ground of jurisdiction, it seems to me that cuts against your response to Judge Kleinfeld's question about whether the particular paragraph that he identified hasn't operated as a waiver to raise the kioser issue. What is clearly not waivable, I believe the adverb clearly is appropriate, what is clearly not waivable is a challenge to subject matter jurisdiction. I agree we're talking about what the statutory limitations are on the authority of a district court. And you're claiming that under kioser, those statutory limitations are being transgressed when a judge undertakes to review the merits of an arbitral decision. But I suggest to you that that's not a subject matter jurisdiction issue. That comes within the range of waivable issues if one enters into an agreement to say, that's not the kind of issue I undertake not to raise that issue in any other court. And the answer to the Court is there are many other issues other than subject matter jurisdiction that simply are not waivable. The analysis of the question posed to me would comport with the Third Circuit's analysis of whether or not parties or the court, with a court order, with court approval, can change the standard of review of an arbitral decision. In the Ninth Circuit, it's clear. The Ninth Circuit explicitly, without qualification, says there is no power by the court or by the parties to change the standard of review. Explicitly or by waiver? Explicitly or by waiver because the fundamental thread of where a court's power to review arbitral decisions comes from, is from the Federal Arbitration Act and from Congress. There is no other way to change that standard of review. It does seem, as Pelley suggested, kind of pointless because parties who want to do the same thing, some of them who tried to do it without anticipating kiosera, which probably couldn't have been anticipated, are just going to be in the position of having wasted hundreds of thousands of dollars in litigation expenses. But for the rest, all they have to do is draw up their papers differently so it's a Rule 53 special master and they can accomplish exactly what they wanted to do in a case like kiosera or this case. Well, there's two other ways they could do it. If the judge will go for it, which he probably will. One, they could provide for a panel of three arbitrators to review the decision of the arbitrator. They could provide for arbitral review. The other way they could do it is they could have Congress amend the Federal Arbitration Act. You didn't really deal with my question. My question is, assuming that we do strictly enforce kiosera, are we doing anything but wasting the litigation expenses of the parties to this case? Because in all future cases, everybody can just use Rule 53 language instead of arbitration language when they draw up stipulations to do exactly what the parties did here. It's not clear to me that Rule 53 has all of the protections of the Federal Arbitration Act. For example, the Federal Arbitration Act has other provisions, which we have not touched upon today, that lend a certain integrity to the arbitration process. There is judicial review under the Federal Arbitration Act, but simply under different standards. And it is, in fact, correct, as the Court queries me, that parties will govern their behavior differently under Lapine 2. But that, of course, is exactly what the en banc court said. They said parties will govern their conduct differently. This will affect litigants before our court. Nevertheless, it is what it is. The Federal Arbitration Act gives only Congress the ability to prescribe judicial review, and the consequences simply are what they are.  We will take a ten-minute recess before hearing the last case on the calendar. Thank you.
judges: Trott, Kleinfeld, Pollak